### In re SEALED CASE.

Nos. 97–3006, 97–3007.

United States Court of Appeals, District of Columbia Circuit.

Nov. 21, 1997.

Before: EDWARDS, Chief Judge; WALD, SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL and GARLAND, Circuit Judges.

On Appellees' Suggestion for Rehearing *In Banc*

### O R D E R

Appellees' Suggestion for Rehearing *In Banc* and the response thereto have been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service did not vote in favor of the suggestion. Upon consideration of the foregoing, it is

ORDERED that the suggestion be denied.

A statement of Circuit Judge TATEL dissenting from the denial of rehearing *in banc*, in which Circuit Judge GINSBURG joins with respect to the issue of attorney-client privilege, is attached.

Circuit Judges SENTELLE and GARLAND did not participate in this matter.

TATEL, Circuit Judge, with whom GINSBURG, Circuit Judge, joins with respect to the issue of attorney-client privilege, dissenting from the denial of rehearing *in banc*:

Dramatically departing from the common law rule that protects the attorney-client privilege after a client's death, and threatening the vitality of that privilege, this case raises issues of exceptional importance worthy of *in banc* consideration. *See* FED. R. APP. P. 35(a)(2). The case especially warrants *in banc* review because the consequences of the court's new balancing test will extend far beyond federal criminal cases in the District of Columbia. Clients involved in civil or criminal proceedings anywhere in the country have no way of knowing whether information they share with their lawyers might someday become relevant to a federal criminal investigation in Washington, D.C. As the Supreme Court noted regarding the psychotherapist privilege, "any State's promise of confidentiality would have little value if the patient were aware that the privilege would not be honored in a federal court." *Jaffee v. Redmond,* —— U.S. ——, ——, 116 S.Ct. 1923, 1930, 135 L.Ed.2d 337 (1996).

As I pointed out in my dissent, the common law rule has been incorporated in the Uniform Rules of Evidence and the Model Code of Evidence, adopted by the Supreme Court's Advisory Committee, and codified by at least twenty state legislatures. *In re Sealed Case,* 124 F.3d 230, 238 (D.C.Cir.1997) (Tatel, J., dissenting). The Independent Counsel cites two cases that have abrogated the privilege after a client's death, but neither is relevant here. In both *State v. Gause,* 107 Ariz. 491, 489 P.2d 830 (1971), and *State v. Kump,* 76 Wyo. 273, 301 P.2d 808 (1956), courts held that an accused husband could not invoke the privilege on behalf of his dead wife to bar his wife's lawyer from testifying, a situation quite different from this case where the attorney himself has invoked the privilege on behalf of his deceased client. As the court in *Gause* said, "the privilege is that of the client and must

be claimed by the client or someone authorized by law to do so on the client's behalf." *Gause,* 489 P.2d at 834. Until this court's decision, only one reported case—a never-cited opinion of a mid-level Pennsylvania appellate court—actually supported posthumous abrogation of the privilege when asserted by the lawyer in a nontestamentary dispute. *Cohen v. Jenkintown Cab Co.,* 238 Pa.Super. 456, 357 A.2d 689 (1976).

According to the Independent Counsel, empirical support is "nonexistent" for the proposition that abrogating the attorney-client privilege after the client's death will chill client communication. Opposition of the United States to Appellees' Petition for Rehearing With Suggestion for Rehearing In Banc at 12. But because the Independent Counsel himself urges overturning the common law rule, and because that rule rests on the proposition that preserving the attorney-client privilege after the client's death is necessary to promote client disclosure, the Independent Counsel bears the responsibility of producing evidence to the contrary. In place of such evidence, he offers only his opinion that "any hypothesized chilling effect would be minimal," *id.,* citing only this court's opinion that it "expect[s]" its balancing test's "chilling effect to fall somewhere between modest and nil," *Sealed Case,* 124 F.3d at 233. Without convincing evidence that abrogating the privilege will do no harm to client communications, this court should not abandon centuries of common law.

Invoking a parade of horribles not before us, the Independent Counsel claims that injustice will result if courts cannot abrogate the attorney-client privilege after the client's death. While in some cases the privilege will deny information to the trier of fact, it does so in order to promote a broader and more important value—encouraging the free flow of information from client to lawyer. The common law long ago determined that the benefits gained by recognizing the privilege posthumously outweigh whatever damage might flow from denying information to the trier of fact in any particular case. *Id.* at 241 (Tatel, J., dissenting).

Petitioner also seeks rehearing *in banc* with respect to the court's work product ruling. *Id.* at 235–37. Because drawing a precise line between fact and opinion work product is a difficult and sensitive question with serious implications for the attorney-client relationship, and because I think the court has drawn the line in the wrong place, this issue also warrants *in banc* review.

The court's conclusion that because the interview was "preliminary" and "initiated" by the client, the lawyer may not have "sharply focused or weeded" the words of the client, *id.* at 236, reflects a view of the lawyer's role very different from my own experience. No lawyer approaches a client's problems with a "blank slate." Appellees' Petition for Rehearing With Suggestion for Rehearing En Banc at 14. Even at a first meeting, regardless of who initiates it, lawyers bring their own judgment, experience, and knowledge of the law to conversations with clients. Of course lawyers may want to encourage wide-ranging discussions at first meetings, but they do so in order to draw out and record information they think might be important. Unless they take verbatim notes, the questions they ask and those facts they write down reflect their own views about what is important to their client's case. Whether courts can require production of attorney work product should turn not on the stage of representation or who initiates a meeting, but on whether the attorney's notes are entirely factual, or whether they instead represent the "opinions, judgments, and thought processes of counsel." *In re Sealed Case,* 676 F.2d 793, 809 (D.C.Cir.1982).

The notes in this case demonstrate quite clearly that the lawyer actively exercised his judgment when interviewing his client. In two hours, he created only three pages of notes. Far from taking verbatim notes, the lawyer obviously wrote down what he thought was significant, omitting everything else. The notes bear the markings of a lawyer focusing the words of his client; he underlined certain words, placing both checkmarks and question marks next to certain sections. The notes clearly represent the opinions, judgments, and thought processes of counsel.

After this decision, no lawyer will risk having his notes end up before a grand jury

because of a judicial finding that he had not "sharply focused or weeded" the words of the client; lawyers will simply stop taking notes at early, critical meetings with clients. Not only will this damage the ability of lawyers to represent their clients but in the end there will be no notes for grand juries to see. Similar consequences, of course, may flow from the court's new attorney-client privilege balancing test; advised that their disclosures might be unprotected after death, clients may simply not talk candidly. As the Supreme Court noted in the psychotherapist privilege context, "[w]ithout a privilege, much of the desirable evidence to which litigants ... seek access ... is unlikely to come into being." *Jaffee,* —— U.S. at ——, 116 S.Ct. at 1929. This court's two new holdings—one chilling client disclosure, the other chilling lawyer note-taking—will damage the quality of legal representation without producing any corresponding benefits to the fact-finding process.